

## NUMBER 13-23-00332-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

MICHAEL TODD PHIPPS,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                    Appellee.

## ON APPEAL FROM THE 399TH DISTRICT COURT
## OF BEXAR COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Tijerina and Peña
Memorandum Opinion by Chief Justice Contreras**

Appellant Michael Todd Phipps was convicted of murder, a first-degree felony, and was sentenced to ninety-nine years' imprisonment. *See* TEX. PENAL CODE ANN. § 19.02. By three issues on appeal, Phipps argues: (1) his constitutional right to a speedy trial was violated; (2) the evidence was insufficient to support his conviction; and (3) the trial court erred by failing to include "transitional instructions" regarding the lesser-included offense

of manslaughter in the jury charge. We affirm.[1]

## I.     BACKGROUND

On August 29, 2019, Phipps was charged by indictment with the murder and manslaughter of his aunt Becky Ann Ibarra, alleged to have occurred on or about June 4, 2019. The murder count alleged that Phipps: (1) intentionally or knowingly caused Becky's death by shooting her with a firearm; or (2) with the intent to cause serious bodily injury, committed an act clearly dangerous to human life which caused Becky's death, by shooting her with a firearm. *See id.* §§ 19.02(b)(1), (2). The manslaughter count alleged that Phipps recklessly caused Becky's death by discharging a firearm at her and in her direction. *See id.* § 19.03(a).

On August 21, 2019, Phipps filed a pre-trial application for writ of habeas corpus seeking reduction in his bond amount; the court denied the application after two hearings in September of 2019. On September 27, 2022, Phipps filed a "Motion for Dismissal Due to Denial of Speedy Trial" which stated:

> Now comes defendant, by and through his undersigned counsel, and moves [for] the dismissal of this charge of Murder. As good cause Defendant would show that his mother, Terri Pantuso Phipps and his grandmother, Ann Pantuso have both developed severe dementia and are unavailable as witnesses in this matter. These ladies testified at Defendant's bond hearing in the Criminal Magistrate Court on September 12[ and] 16, 2019[, and] since that date both women have lost their recollections about the incident which led to this charge. During the C[OVID-]19 Pandemic three trial setting[s] were ordered on March 26, 2020; May 28, 2020; and May 25, 2021. No trials were held on those dates. Defendant is prejudiced by the lack of trials during the last two and [a] half years during which time his only witnesses have lost their mental faculties.

After a hearing on October 19, 2022, the trial court denied the motion. Later, Phipps filed

---

[1] This appeal was transferred from the Fourth Court of Appeals in San Antonio pursuant to an order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001(a).

a sworn motion for a charge instruction on community supervision with respect to the manslaughter count. *See* TEX. CODE CRIM. PROC. ANN. art. 42A.055(b)(1).

Trial took place between June 26 and June 29, 2023. Testimony established that 86-year-old Ann Pantuso called 911 on Tuesday, June 4, 2019, to report a shooting at her residence in Castle Hills, where she lived with her two adult daughters Becky and Terri, as well as Terri's son Phipps. An audio recording of the 911 call was entered into evidence without objection. Ann informed the dispatcher that Becky had been shot and that the person who shot Becky did so intentionally, was a family member, and was still at the scene. When police arrived, Ann instructed Phipps to go outside to talk to the officers, and she then told police officers that Phipps shot Becky.

Officer David Dean Fawcett of the Castle Hills Police Department responded to the scene and observed Becky laying on her back, holding a blue debit card in her right hand, and with a gunshot wound to her chest. Fawcett stated that he had previously been called out to Ann's residence in 2018 because there was a disturbance which involved Ann wanting Phipps to leave her residence. Another Castle Hills Police Department officer, Paul Turner, examined the scene and did not observe any signs of a fight or struggle before the shooting. Turner spoke briefly to Phipps, who informed him that he left the weapon "on the dining room table," which is consistent with what officers found at the scene.

Medics administered treatment to Becky at the scene, but she died from her injury at the age of 65. After an autopsy, a forensic pathologist determined that Becky's cause of death was a single gunshot wound to the inner right side of her chest, with "burning of the skin surface immediately around the hole" indicating "contact range firing." Becky also

had "relatively fresh bruises" on each thigh and her upper left arm.

Police recovered a five-shot revolver from the scene of the shooting, as well as four .38 Special cartridges and one spent .38 Special casing. They also recovered Becky's clothes, and a forensic analyst testified that there was damage around the bullet hole in her shirt "consistent with burning or singeing," which indicated a "close contact shot." Police took swabs from the hands of those at the scene, and pursuant to forensic testing, gunshot residue was found to be present on Ann's hands and Terri's hands, but not Phipps's hands. Gunshot residue was found, however, on Phipps's shirt.

Turner interviewed Phipps at the police station, and a video recording of the interview was entered into evidence. Turner stated he administered *Miranda* rights to Phipps before questioning him. During the interview, Phipps claimed that he did not intend to shoot Becky and that the "[t]he gun went off accidentally." He wrote and signed the following statement:

> I was defending my mother that was being ass[a]ulted then I was ass[a]ulted and attacked[. W]hen attacked I for defence [sic] I took my gun out. I was pinned to a tab[]le by someone twice my size[.] I feared be disarmed [sic] and for my life. In the struggle the gun went off while trying to get [the] person off me. I am very sorry[.] I am very sorry someone was hurt[.] I was scared for my life.

Edward Wallace, the forensic scientist supervisor in the firearms section of the Bexar County Criminal Investigation Laboratory, testified that he examined the .38 Special Ruger revolver used to shoot Becky. Wallace stated the gun is a double-action revolver, which means that there are two different ways to fire it: "You can cock the hammer manually and then pull the trigger so all the trigger does is release the hammer. That's a single-action. Or you can just pull the trigger and that will cock and release the hammer. So that means the trigger is doing two things, so that's the double-action." He

4

stated that it takes five-and-a-half to six pounds of pressure to fire the gun in single-action, whereas it takes eleven to eleven-and-a-half pounds of pressure in double-action.[2] Wallace further stated that this gun has a safety mechanism called a "transfer bar," "which means that in order for the gun to fire, the trigger has to be pulled all the way to the rear for the hammer to strike that transfer bar, which then strikes the firing pin of the gun, which then strikes the cartridge in the chamber." According to Wallace, because of the transfer bar mechanism, an accidental discharge of this particular firearm is "very unlikely."

Becky's brother Paul Pantuso testified that, at the time of the shooting, Ann was receiving income from social security and retirement benefits, and Becky was contributing to the household income and taking care of Ann. Paul stated that Ann passed away in February 2023, and that he, Becky, and Terri were beneficiaries of Ann's will. According to Paul, after Becky was killed, he "went to [Ann]'s house looking for the will" but could not find it, and "[Phipps] told [Paul] he changed the will." Paul agreed that Becky did not want Phipps living with Ann "because of [Ann's] condition," and that there was "tension" between Becky and Phipps.

Audio recordings of calls made by Phipps from jail were entered into evidence. In one call, Phipps asked Ann what she told the prosecutor's office; Ann said that "[w]e only answered questions the way you would have wanted us to." In another call, Phipps told Ann to "say the right thing" to his attorney, and when Ann asked what he wanted her to say, he replied with his version of events. In a third call, Phipps told Terri: "Remember what happened was that I was protecting you."

---

[2] For comparison, Wallace explained that it takes about three-and-a-half to four pounds of pressure to open the pull tab on soda can.

Because Ann and Terri were deceased at the time of trial, the State offered into evidence transcripts of their testimony from Phipps's bond modification hearing in September 2023. The trial court admitted the transcripts without objection. Terri testified at the bond hearing that, on June 4, 2019, she gave Becky her debit card because Becky wanted to help her shop, but she then remembered that she told Phipps he could take her grocery shopping. Terri testified that Becky "refused" to give the card back and "started fighting" with her. She said Becky "shook" her "very, very hard" and "slammed [Phipps] on the table." She could not remember Becky being shot, but she remembered telling a detective that a shot was fired. Terri said Becky had hurt her "many, many times" before, and that she and Phipps were afraid of her. On cross-examination, Terri acknowledged that she "blacked out" during the incident and only recalled Becky "shaking" her "probably two weeks" prior to her testimony. She further stated that she has been taking Percocet, Soma, and Xanax "for 24 years" but did not take them on the day of the hearing.

In her hearing testimony, Ann testified that Phipps is small in stature, whereas Becky was "a lot taller" and heavier and "made at least two of him." She stated that she saw Becky choke Terri two years earlier, and "it ruined [Terri's] voice." She said that, on June 4, 2019, she was taking a nap in her bedroom when she heard what sounded like a "very distant" gunshot. She went out to the dining area and saw Becky "on the floor" and Phipps "standing there stunned" with a gun in his hand on the opposite side of the dining table.

The jury found Phipps guilty on both counts. After a punishment hearing, the jury assessed punishment at ninety-nine years' imprisonment for murder and twenty years'

6

imprisonment for manslaughter. The trial court set aside the verdict on the manslaughter charge, and the record contains a judgment of conviction for murder only. Phipps filed a motion for new trial which was overruled by operation of law, and this appeal followed.

## II. DISCUSSION

### A. Right to Speedy Trial

By his first issue on appeal, Phipps contends that his constitutional right to a speedy trial was violated. *See* U.S. CONST. amends. VI, XIV; TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. ANN. art. 1.05; *Gonzales v. State*, 435 S.W.3d 801, 808 (Tex. Crim. App. 2014). We analyze speedy trial claims "on an ad hoc basis," weighing and balancing four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant. *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008) (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). "While the State has the burden of justifying the length of delay, the defendant has the burden of proving the assertion of the right and showing prejudice." *Id.* "The defendant's burden of proof on the latter two factors 'varies inversely' with the State's degree of culpability for the delay." *Id.*

We apply a bifurcated standard of review to a trial court's ruling on a speedy trial claim. *Id.* at 282. We review the factual components for an abuse of discretion, while we review the legal components de novo. *Id.* Review of the individual *Barker* factors necessarily involves factual determinations and legal conclusions, but the balancing test as a whole is "a purely legal question." *Id.* With regard to the trial court's resolution of factual issues, we view all the evidence in the light most favorable to the trial court's ultimate ruling. *Id.*

### 1. Length of Delay

The length of the delay between an initial charge and the defendant's demand for speedy trial acts as a triggering mechanism. *See Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002); *State v. Munoz*, 991 S.W.2d 818, 821 (Tex. Crim. App. 1999). Unless the delay is presumptively prejudicial, courts need not examine the other three factors. *Zamorano*, 84 S.W.3d at 648. Thus, any speedy trial analysis depends first upon whether the delay is more than "ordinary"; if so, the longer the delay beyond that which is ordinary, the more prejudicial that delay is to the defendant. *Gonzalez v. State*, 435 S.W.3d 801, 809 (Tex. Crim. App. 2014); *Zamorano*, 84 S.W.3d at 649.

Here, 1,211 days—or nearly forty months—elapsed between Phipps's arrest on June 4, 2019, and the filing of his motion on September 27, 2022. This delay is presumptively prejudicial and sufficient to trigger a *Barker* analysis. *See Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992) (noting that a one-year delay is presumptively prejudicial); *Shaw v. State*, 117 S.W.3d 883, 888–89 (Tex. Crim. App. 2003) (same). This factor weighs in Phipps's favor. *See Gonzalez*, 435 S.W.3d at 809; *Zamorano*, 84 S.W.3d at 649.

### 2. Reasons for Delay

Once the length of time is found to be presumptively prejudicial, the burden of justifying the delay falls on the State. *Smith v. State*, 436 S.W.3d 353, 355 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (citing *Cantu*, 253 S.W.3d at 280); *see Zamorano*, 84 S.W.3d at 649. For purposes of this analysis, unjustifiable reasons for the delay count towards the "length of delay," while justifiable reasons for delay do not. *Gonzales*, 435 S.W.3d at 810; *see Munoz*, 991 S.W.2d at 822 ("A valid reason for the delay should not

be weighed against the government at all."). For example,

> [a] deliberate attempt to delay the trial in order to hamper the defense should be weighed heavily against the government. A more neutral reason such as negligence or overcrowded court should be weighed less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker*, 407 U.S. at 531.

At the October 19, 2022 hearing on Phipps's "Motion for Dismissal Due to Denial of Speedy Trial," the prosecutor stated that the reason for the delay was that "the court was closed down" due to the COVID-19 pandemic.[3] Phipps does not dispute that disruption to the court system caused by the COVID-19 pandemic, including closures and restrictions on jury service, constitutes a "justifiable reason" for delay. *See Gonzales*, 435 S.W.3d at 810; *see Munoz*, 991 S.W.2d at 822. He notes, however, that this does not account for the time period between his arrest and the onset of the pandemic, nor does it account for the time period between when courts reopened and when he filed his motion.

The Texas Supreme Court issued its *First Emergency Order Regarding the COVID-19 State of Disaster* on March 13, 2020. *See* 596 S.W.3d 265 (Tex. 2020) (providing that "all courts in Texas may in any case, civil or criminal—and must to avoid risk to court staff, parties, attorneys, jurors, and the public—modify or suspend any and all deadlines and procedures . . . for a stated period ending no later than 30 days after the Governor's state of disaster has been lifted"). And as Phipps notes, the Local Administrative Judge for Bexar County Courts issued an order on January 20, 2022,

---

[3] The prosecutor also observed that "most murder cases don't go to trial or aren't ready for trial until about a year."

stating that "in person jury service in Bexar County will continue to be suspended" until at least March 1, 2022.

Phipps is correct that pandemic-related disruptions do not explain the delay of 283 days prior to the pandemic (from June 4, 2019, to March 13, 2020), nor do they explain the delay of 210 days after the earliest date jury service could have resumed in Bexar County (from March 1, 2022, to September 27, 2022). The State does not provide any explanation for these 493 days of delay, though there is no indication that the State deliberately caused any of it. This factor weighs slightly in Phipps's favor. *See Barker*, 407 U.S. at 531.

### 3. Assertion of Right

Phipps first asserted his right to a speedy trial in his motion filed September 27, 2022; however, the motion asked the trial court only to dismiss the case, not to set a trial date. "If a defendant fails to first seek a speedy trial before seeking dismissal of the charges, he should provide cogent reasons for this failure." *Cantu*, 253 S.W.3d at 283; *see State v. Davis*, 549 S.W.3d 688, 704 (Tex. App.—Austin 2017, no pet.). Phipps does not offer any such reasons here.[4] And, Phipps did not re-assert his right to a speedy trial at any time after the trial court denied his motion to dismiss. "Repeated requests for a speedy trial weigh heavily in favor of the defendant, while the failure to make such requests supports an inference that the defendant does not really want a trial, he wants only dismissal." *Cantu*, 253 S.W.3d at 283; *see Henson v. State*, 407 S.W.3d 764, 769 (Tex. Crim. App. 2013). This factor weighs against Phipps.

---

[4] In his motion, Phipps asserted that "three trial setting[s] were ordered on March 26, 2020; May 28, 2020; and May 25, 2021." However, the prosecutor stated at the hearing that, once courts opened up, only "first settings" and "settings for reduction of bond" were ordered, and "[t]here has not actually been a trial setting in this case."

10

**4. Prejudice**

"Because 'pre[-]trial delay is often both inevitable and wholly justifiable,' the fourth *Barker* factor examines whether and to what extent the delay has prejudiced the defendant." *Cantu*, 253 S.W.3d at 285 (quoting *Doggett*, 505 U.S. at 656). We analyze the prejudice to appellant in light of the interest the speedy-trial right was designed to protect: (1) to prevent oppressive pretrial incarceration, (2) to minimize the accused's anxiety and concern, and (3) to limit the possibility that the accused's defense will be impaired. *Id.* Prejudice to the accused's defense is the most serious "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*

In his motion, Phipps argued solely that he was prejudiced by the delay because Ann and Terri—the only two people aside from Phipps and Becky who were present at Ann's residence at the time of the shooting—have both "developed severe dementia and are unavailable as witnesses in this matter." At the hearing, Phipps's counsel stated that Ann executed a will in 2020 and a power of attorney in early 2022, thereby suggesting that Ann would have been competent to testify had trial been set earlier. Counsel contended that Phipps "has lost the availability of this evidence" and "[w]e have lost the ability to present our defense because of the delay."[5] He acknowledges that the testimony of both Ann and Terri at the September 2019 bond reduction hearings was admitted at

---

[5] On appeal, Phipps notes that he testified regarding the consequences of his incarceration at the bond reduction hearings in September 2019. Specifically, he stated that a friend of his had to "t[ake] over payments" for his car since he was jailed. He also stated that "I don't fit in with these men in [jail]" and "I feel like it's a nightmare I can't wake up from." A friend of his also testified at trial that Phipps "has a lot of anxiety and stuff like that." But "evidence of generalized anxiety, though relevant, is not sufficient proof of prejudice under the *Barker* test, especially when it is no greater anxiety or concern beyond the level normally associated with a criminal charge or investigation." *Cantu v. State*, 253 S.W.3d 273, 286 (Tex. Crim. App. 2008).

trial, but he argues on appeal that he was prevented "from developing the wider scope of the witnesses' testimony in the bond reduction hearing and [from] presenting the testimony in person before the jury."

The record reflects that both Ann and Terri passed away between the time of the hearing on Phipps's motion and his trial. When a witness dies or disappears during a delay, "a defendant need only show that the prospective witness was believed to be material to the case, not that the witness would have testified favorably to the defense." *Webb v. State*, 36 S.W.3d 164, 174–75 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). We agree with Phipps that, even though Ann and Terri were not eyewitnesses to the shooting, their testimony may have been material to the case because it was arguably probative as to Phipps's self-defense theory. That said, because Phipps largely relied on that theory at the bond reduction hearing, the witnesses were questioned extensively about it there, and they were subject to cross-examination. Phipps claims that, "[b]ut for the limited relevance, scope and timing limitations of the bond hearing, [he] would have questioned the witnesses more extensively about defenses presented during the jury trial." However, he does not explain what additional questions he would have asked, or what additional answers the witnesses would have given, that would have aided his defense. *See id.* at 174 ("[W]e consider the information the appellant claims this witness would have provided to determine if the appellant was prejudiced as a result of the delay."). Further, he did not attempt to obtain more detailed statements of Ann or Terri between the time of the hearings and the time of trial. *See id.* at 176 ("In determining if the witness was believed to be material to the case, a court can consider whether there is any evidence that the defendant attempted to obtain the witness's statement during the

delay."). Because Phipps has not shown that his defense was impaired by the delay, his factor weighs slightly against Phipps. *See Cantu*, 253 S.W.3d at 285.

### 5. Balancing Test

In balancing the relevant factors, we conclude that the trial court did not abuse its discretion in making the legal determination that Phipps's constitutional right to speedy trial was not violated. *See id.* at 282. Although the four-year period between Phipps's arrest and his trial was long, the majority of the delay can be attributed to the COVID-19 pandemic, and there is no suggestion that the remaining delay was the fault of the State. Most importantly, because the jury at his trial had access to the testimony which Phipps claims he was not able to present, and because he does not articulate how additional in-person trial testimony would have benefitted his defense, Phipps has not demonstrated prejudice sufficient to entitle him to reversal. *See id.* We overrule his first issue.

## B. Evidentiary Sufficiency

By his second issue, Phipps contends the evidence was insufficient to support his conviction.

### 1. Standard of Review and Applicable Law

"Evidence is sufficient to support a criminal conviction if a rational jury could find each essential element of the offense beyond a reasonable doubt." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In a sufficiency review, we view the evidence in the light most favorable to the verdict and consider all of the admitted evidence. *Id.* We consider both direct and circumstantial evidence as well as all reasonable inferences that may be drawn from the evidence and are not mere speculation. *See id.*; *Villa v. State*, 514 S.W.3d 227, 232 (Tex.

13

Crim. App. 2017); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses"; therefore, "[w]hen the jury could reasonably draw conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict." *Stahmann*, 602 S.W.3d at 577; *see* TEX. CODE CRIM. PROC. ANN. art. 38.04.

Sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). A hypothetically correct charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* (citing *Malik*, 953 S.W.2d at 240). "The law 'authorized by the indictment' consists of the statutory elements of the offense as modified by the indictment allegations." *Id.*

A hypothetically correct jury charge in this case, consistent with the indictment, would instruct the jury to find Phipps guilty of murder if he: (1) intentionally or knowingly caused Becky's death by shooting her with a firearm; or (2) with intent to cause serious bodily injury, committed an act clearly dangerous to human life that caused Becky's death, by shooting her with a firearm. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2). A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. *Id.* § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

14

## 2.     Analysis

Phipps argues on appeal that "[t]here is no evidence that [he] specifically intended to kill [Becky] or knowingly intended [sic] to kill [Becky]." However, the State did not need to prove a specific intent to kill; as noted, the evidence would be sufficient to support the verdict if it showed that Phipps intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused Becky's death. *See id.* § 19.02(b)(2). In his brief, Phipps does not address whether the evidence would be sufficient to support that finding.

In any event, we disagree that there was no evidence of an intent to cause death. The evidence before the jury included Ann's 911 call in which she told the dispatcher that Phipps shot Becky intentionally. Further, intent may generally be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). Phipps stated in his written custodial statement that he "took [his] gun out" while in a struggle with Becky, and Terri stated she and Becky were fighting, but officers said there was no sign of a fight or struggle before the shooting. The physical evidence established that Becky was shot from very close range. There was evidence that Becky and Phipps had a contentious relationship and that Becky did not want Phipps to live with Ann. And, Phipps called his mother and grandmother from jail in order to coordinate their stories. Although Phipps maintained in his custodial interview that the shooting was an accident, the jury was free to disbelieve him, especially in light of Wallace's testimony that an accidental discharge of this gun would be unlikely due to its safety mechanism. *See Stahmann*, 602 S.W.3d at 577.

Phipps notes that the jury found him guilty of both murder and manslaughter, and

15

he argues that the same conduct "cannot for purposes of legal sufficiency support both the mental culpability of specific intent to kill the complainant, and reckless culpability to cause the death of the complainant." *See* Tᴇx. Pᴇɴᴀʟ Cᴏᴅᴇ Aɴɴ. § 19.04(a) (providing that a person commits manslaughter " if he recklessly causes the death of an individual"); *id.* § 6.03(c) ("A person acts recklessly . . . with respect to . . . the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur."). Citing *Dunham v. State*, 666 S.W.3d 477 (Tex. Crim. App. 2023), *O'Brien v. State*, 544 S.W.3d 376, 388 (Tex. Crim. App. 2018), and *Calton v. State*, 176 S.W.3d 231, 234 (Tex. Crim. App. 2005), he contends that evidence which indicated he "recklessly" discharged a firearm "factually refuted and negated the sufficiency of evidence of specific intent to kill the complainant." Again, we disagree. The cases cited do not in any way indicate that evidence of reckless conduct refutes or negates evidence of intentional conduct, and we find no other authority in support of that proposition.

We conclude that a rational jury could have found beyond a reasonable doubt, from the evidence presented, that Phipps either intentionally or knowingly caused Becky's death, or with intent to cause serious bodily injury, committed an act clearly dangerous to human life that caused Becky's death, in the manner alleged in the indictment. *See* Tᴇx. Pᴇɴᴀʟ Cᴏᴅᴇ Aɴɴ. § 19.02(b)(1), (2). Phipps's second issue is overruled.

## C. Jury Charge

By his third issue, Phipps argues the jury charge was erroneous because it did not contain "transitional instructions for the lesser included offense of manslaughter."

### 1. Standard of Review and Applicable Law

After a jury trial in a felony case, the trial court is required to submit to the jury a

16

"written charge distinctly setting forth the law applicable to the case; not expressing any opinion as to the weight of the evidence, not summing up the testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury." TEX. CODE CRIM. PROC. ANN. art. 36.14. We review the trial court's refusal to submit a jury charge instruction for abuse of discretion. *Wesbrook v. State*, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000). A trial court has no discretion in determining what the law is or applying the law to the facts. *State v. Kurtz*, 152 S.W.3d 72, 81 (Tex. Crim. App. 2004).

If we find error in the jury charge, and the defendant preserved the alleged error by a timely request or objection, then we must reverse as long as the error was not harmless. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013); *see Almanza v. State*, 686 S.W.2d 157, 174 (Tex. Crim. App. 1984). But if an error is not preserved at trial, it requires reversal only if appellant suffered "egregious harm" as a result of the error. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013) (citing *Almanza*, 686 S.W.2d at 171). "An erroneous jury charge is egregiously harmful if it affects the very basis of the case, deprives the accused of a valuable right, or vitally affects a defensive theory." *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022). A finding of egregious harm must be based on "actual harm rather than theoretical harm." *Id.* In reviewing for egregious harm, we consider "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171.

### 2. Analysis

In *Sandoval v. State*, the Texas Court of Criminal Appeals held that, pursuant to article 37.08 of the code of criminal procedure, "a unanimous finding of guilt on a lesser-included offense necessarily requires a unanimous acquittal on the higher offense." 665 S.W.3d 496, 535 (Tex. Crim. App. 2022); *see* TEX. CODE CRIM. PROC. ANN. art. 37.08 ("In a prosecution for an offense with lesser included offenses, the jury may find the defendant not guilty of the greater offense, but guilty of any lesser included offense."). The *Sandoval* Court noted that "[t]he legislature contemplated that a conviction on a lesser-included offense would necessarily be a verdict of acquittal on the greater offense, not simply a situation where the jury could not agree on the greater offense." 65 S.W.3d at 535. Therefore, "in Texas, a jury must be required to agree on an acquittal of the greater offense before it can return a conviction on a lesser-included offense." *Id.* at 537. Phipps asserts that, pursuant to *Sandoval*, "the jury must be instructed not to consider the lesser-included instructions until they have first acquitted the defendant of the greater offense." He contends the charge here was erroneous because it did not contain such a "transitional instruction" between the murder count and the manslaughter count. *See id.* at 532 ("Jury instructions that tell the jury when and how to proceed from deliberating about a greater offense to deliberating about a lesser-included offense are sometimes called 'transitional instructions.'").

Assuming but not deciding that the lack of a transitional instruction constituted error, we proceed to examine whether Phipps suffered the requisite level of harm. It is undisputed that defense counsel did not request a transitional instruction or object to its absence; accordingly, we will reverse only if Phipps suffered egregious harm. *See Nava*,

18

415 S.W.3d at 298 (citing *Almanza*, 686 S.W.2d at 171).

Phipps claims in part that, because of the alleged error, the charge "did not require that the jurors unanimously agree upon one of the two alternative counts alleged in the indictment." In support of this contention, he cites case law generally establishing that a conviction must be based on a unanimous verdict. *See, e.g.*, *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005) ("When the State charges different criminal acts, regardless of whether those acts constitute violations of the same or different statutory provisions, the jury must be instructed that it cannot return a guilty verdict unless it unanimously agrees upon the commission of any one of these criminal acts."). We disagree. The charge in this case explicitly stated as to each count that, in order to return a guilty verdict, the jury must (1) "unanimously find from the evidence beyond a reasonable doubt" that Phipps committed the elements of each offense, and (2) "unanimously find beyond a reasonable doubt that [Phipps] did not act in self[-]defense." Phipps does not cite any authority, and we find none, indicating that the lack of a transitional instruction between a greater and lesser-included offense may potentially give rise to a non-unanimous verdict. And we presume the jury followed the trial court's instructions where, as here, there is nothing in the record indicating otherwise. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009).

Phipps also emphasizes that, during voir dire, the prosecutor told the jury that it could recommend community supervision if it found Phipps guilty of manslaughter. *See* Tex. Code Crim. Proc. Ann. art. 42A.055(b)(1). Further, the prosecutor repeatedly advised the jury during closing arguments that it could find Phipps guilty of both murder and manslaughter. He seems to suggest that, had a transitional instruction been included

19

in the charge, the jury would not have found him guilty of murder because it intended to recommend community supervision. However, the prosecutor also explained at voir dire that, if Phipps was found guilty on both counts, punishment would be assessed on only one of the counts. Moreover, Phipps explicitly withdrew his request for community supervision after the punishment phase, and the jury was not ultimately given the option to recommend community supervision in the punishment charge.

Crucially, although the jury found Phipps guilty of both murder and manslaughter and assessed punishment on both counts, the trial court set aside the manslaughter verdict and rendered judgment only on the murder count. Any harm occasioned by the manslaughter verdict was fully remedied by this ruling. Phipps suggests that, by finding him guilty of manslaughter, the jury necessarily found that he lacked the *mens rea* necessary to convict him of murder. We disagree with that suggestion. Assuming manslaughter was a lesser-included offense of murder as charged in this case,[6] the two offenses differ only "in the respect that a less culpable mental state suffices to establish" manslaughter, *see id.* art. 37.09(3) (defining lesser-included offense), and "[p]roof of a higher degree of culpability than that charged constitutes proof of the culpability charged." TEX. PENAL CODE ANN. § 6.02(e). In other words, to the extent the jury found that Phipps committed murder by intentionally or knowingly causing Becky's death, it also necessarily

---

[6] Again, though the jury found Phipps guilty of murder, it did not necessarily find that he intentionally or knowingly caused Becky's death. Instead, it could have found Phipps guilty of murder on the basis that, with intent to cause serious bodily injury, he committed an act clearly dangerous to human life that caused Becky's death. *See* TEX. PENAL CODE ANN. § 19.03(b)(2). If the murder verdict was based on this latter theory, then manslaughter would not be a lesser-included offense of murder. *See* TEX. CODE CRIM. PROC. ANN. art. 37.09 ("An offense is a lesser included offense if: (1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged; (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission; (3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or (4) it consists of an attempt to commit the offense charged or an otherwise included offense.").

found that Phipps recklessly caused her death so as to support a guilty verdict on the manslaughter charge. *See id.*

Considering the entire record, including the evidence, counsel's arguments, and the charge as a whole, we cannot conclude that Phipps suffered actual, egregious harm from the lack of a transitional instruction. *See Alcoser*, 663 S.W.3d at 165; *Almanza*, 686 S.W.2d at 171. We overrule his third issue.

### III. CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
28th day of August, 2024.